IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

v.                                  No. CR 09-672 MV

AGAPITO FRANCO-LOPEZ,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** came before the Court on Defendant's Motion to Renew his Motion for

Judgement of Acquittal pursuant to Federal Rule of Criminal Procedure 29, dated February 25,

2010 [Doc. 99].  The Court has considered the motion, the government's response, the relevant

law, and being otherwise fully advised of the premises therein finds the motion is not well-taken

and will be **DENIED** for the reasons stated herein.

## PROCEDURAL HISTORY

On March 18, 2009, Defendant was indicted on two counts of Transporting Illegal Aliens

and Aiding and Abetting in violation of 8 U.S.C. §§ 1324(a)(1)(A)(ii) and (a)(1)(A)(v)(II), and

one count of Conspiracy to commit said transportation in violation of 8 U.S.C. §

1324(a)(1)(A)(v)(I).  Count 1 of the Indictment alleges conspiracy.  Count 2 pertains to the

alleged transportation of Felipe Hernandez-Avila, whereas Count 3 alleges that Defendant

unlawfully transported Valente Mozqueda-Martinez.  Defendant proceeded to trial, which

commenced on February 9, 2010.  After trial commenced but before the government had

presented all its evidence, the Court issued an Order Granting the government's unopposed

Motion to Dismiss Count 2 of the Indictment [Doc. 89].[1]  At the close of the government's case, Defendant moved for judgment of acquittal as to Counts 1 and 3 pursuant to Federal Rule of Criminal Procedure 29(a).  The Court denied Defendant's motion and the case proceeded to the jury, which returned a verdict of guilty as to both counts on February 11, 2010.  Defendant now renews his Motion for Judgment of Acquittal pursuant to Federal Rule of Criminal Procedure 29(c).[2]  Defendant specifically argues that the government failed to present evidence sufficient to prove that Valente Mozqueda-Martinez – the sole individual Defendant was convicted of transporting – ever entered the United States.  Doc. 99 at 3.  With respect to the conspiracy count, Defendant argues that the government failed to prove the necessary element of interdependence among the members of the conspiracy.  Doc. 99 at 2.

## LEGAL STANDARD

A conviction can constitutionally stand only if, after viewing the evidence in the light most favorable to the prosecution, a rational trier-of-fact could have found the essential elements of the crime charged beyond a reasonable doubt.  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). To be sufficient, the evidence supporting the conviction must be substantial; that is, it must do more than raise a mere suspicion of guilt.  *United States v. Troutman*, 814 F.2d 1428, 1455 (10th Cir. 1987) (citations omitted).  However, it need not conclusively exclude every other reasonable hypothesis and it need not negate all possibilities except guilt.  *United States v. Vallejos*, 421

---

[1] The Court entered this order pursuant to the government's representation that Mr. Hernandez-Avila had absconded, and would therefore not be testifying against Defendant at trial.

[2] In his Motion, Defendant "moves this Court pursuant to Rule 29(e) of the Federal Rules of Criminal Procedure to grant a judgment of acquital [sic][.]"  The Court construes Defendant's citation to "Rule 29(e)" as a typographical error, and proceeds to evaluate his motion under Rule 29(c).

2

F.3d 1119, 1122 (10th Cir. 2005) (citations omitted).

## EVIDENCE PRESENTED AT TRIAL

At trial, the government presented seven witnesses and ten exhibits.  The government's first witness, co-defendant Benito Hernandez, Jr., testified as to his agreement with Defendant to transport a group of undocumented individuals into the United States.  Mr. Hernandez stated that he received a phone call from Defendant on the morning of November 23, 2008.  Defendant told Mr. Hernandez that he was experiencing car problems, and asked Mr. Hernandez to pick him up. To Mr. Hernandez's surprise, after he picked up Defendant, Defendant informed him that they needed to make a stop to pick up a group of undocumented immigrants.  Mr. Hernandez stated that this shocked him a little bit, but conceded that he needed money because of various personal and financial problems he was experiencing.  Mr. Hernandez further conceded that he was not completely shocked to learn of Defendant's plans, as he and Defendant had transported a group of undocumented individuals the previous month.

Mr. Hernandez proceeded to describe the co-defendants' drive to a location just north of the United States-Mexico border where Defendant had arranged to pick up the group of undocumented persons.  He noted that Defendant received several phone calls, which Mr. Hernandez believed to be from someone in Mexico, after which Defendant instructed Mr. Hernandez to drive a little bit faster.  Mr. Hernandez then described the sequence of events from the co-defendants' arrival at the location where they picked up the group of individuals, up until their subsequent apprehension by the United States Border Patrol.

Following the testimony of Benito Hernandez, Jr., the government called Marion Anest, an agent with the United States Border Patrol.  Agent Anest testified that on the date of the

offense, he was stationed on top of a mesa in Sunland Park, New Mexico, overlooking the

United States-Mexico border.  He stated that the mesa was within a quarter mile of the border.

The government introduced two exhibits depicting the mesa.  Gov't Exs. 6 & 13.

Agent Anest testified that on the morning of November 23, 2008, he was using

binoculars to monitor the valley to the east of the mesa for the purpose of detecting illegal

entrants into the United States.  He stated that at about 9:00 a.m., he received a radio report of

the activation of a sensor, or motion detector, in the valley north of the border.  Although

sometimes the movement of animals, or even a gust of wind, sets off these sensors, Agent Anest

stated that often times the alarm signals the movement of people attempting to enter the United

States without detection.  He stated that upon receiving the radio report, he immediately scanned

the valley to look for illegal entrants, and within about one minute, he observed six to ten

individuals running down Ardovino Drive.  Government Exhibit 6 depicts Ardovino Drive,

which appears to run roughly north-south, and Government Exhibit 10 depicts Ardovino Drive

more closely.  Agent Anest stated that the individuals he observed were running north, away

from Mexico.  Referring to Exhibit 10, he pointed to a dirt area just west of Ardovino Drive

where he initially saw the group running north.

On cross-examination, defense counsel had the following exchange with Agent Anest:

Q:      [P]art of your job duties is to keep an eye on the border fence; correct?
A:      Correct.
Q:      And, would it be fair to say that the border fence has, aside from
         electronic sensors, it also has, in certain places, cameras?
A:      That's correct.
Q:      And on this particular day, the call that you received came in through
         sector radio; correct?
A:      Yes.
Q:      And it came in from the El Paso side of the sector; right?
A:      It came from – the radio shop is in El Paso, yes.

4

. . .

Q:     And you were advised by sector radio that there had been activation of a
       sensor . . . close to your location?

A:     Yes.

Q:     And shortly thereafter, you were able to spot people who you believe had
       come across illegally; is that correct?

A:     Yes. . . .

Q:     Now, from the moment you got the call to the moment you spotted them,
       how much time, would you say, elapsed?

A:     Oh, I would say approximately a minute, minute and a half.

Q:     And from that point on, all the way to the time that the van stopped and
       people were arrested, at any point did you – did you ever lose sight of the
       van?

A:     Excuse me?

Q:     Let me ask that again.  When you got a call from sector radio, you
       immediately used your binoculars and located the individuals who you
       believe could have tripped the electronic sensor; correct?

A:     That's correct.

Q:     Now, from that point on, you continued to keep an eye on them until
       another U.S. Border Patrol unit, apart from yours, was able to turn its
       lights on and give chase to the van?  Is that a fair statement?

A:     That's correct.

Q:     From the moment that you saw them enter the United States to the
       moment you saw Agent Serrano turn on his lights on his United States
       Border Patrol vehicle, at any point did you lose track of the van or the
       people?

A:     In your question – I did not physically see them enter the United States.

Q:     And I'm not asking about that.  All I'm asking, as you're watching
       through the binoculars, at any point did you lose them for five, ten, fifteen
       minutes and then get them back again?

A:     No.

Q:     At all times you were watching them through your binoculars; is that
       correct?

A:     That's correct.

Q:     And it also a fair statement you were also on the radio advising nearby
       units what they needed to do in order to make a stop of the van?

A:     That's correct.

Q:     Is it also fair to say that the United States Border Patrol basically runs a
       perimeter type of defense to the U.S./Mexico border?

A:     Yes.

Q:     And would it be fair to say that you were the first line of defense?

A:     Yes.

. . .

Q:     The first time that you were able to see the individuals who you kept on

5

> surveillance through your binoculars, how far had they traveled into the
> United States, in distance?
>
> A:    Approximately . . . between a quarter mile and half a mile.
>
> . . .
>
> Q:    So, would it be fair to say that shortly after they entered, they were on
> surveillance by you through your binoculars?
>
> A:    Yes.
>
> Q:    And at no point did you ever lost sight of them?
>
> A:    Until the other agents made contact, correct.

Tr. of Proceedings at 72-77.[3]

Next the government presented the testimony of Valente Mozqueda-Martinez. Mr. Mozqueda-Martinez testified that he is a Mexican national who attempted to enter the United States illegally on November 23, 2008. Mr. Mozqueda-Martinez explained that, along with a group of roughly twelve to fourteen people, he ran across the United States-Mexico border and boarded a van, which Border Patrol agents subsequently stopped.[4]

Following Mr. Mozqueda-Martinez's testimony, the government presented the testimony of Border Patrol Agent Jahshua Binkley. Agent Binkley testified that on the morning of November 23, 2008, he received a call from another agent who stated that a group of people was boarding a van in Sunland Park, close to where Agent Binkley and his partner were stationed. About twenty or thirty seconds later, Agent Binkley observed the van as described by the agent who called him, and he and his partner began following the van in their Border Patrol vehicle.

---

[3] This Order cites to the court reporter's unofficial transcript. All citations to page numbers are approximate and subject to change on the official edited transcript.

[4] At no point during direct- or cross-examination did Mr. Mozqueda-Martinez state that Defendant was in the van he boarded. However, this fact is not in dispute, as later testimony from Border Patrol and Immigration and Customs Enforcement agents demonstrated that the van was under constant surveillance from the moment Mr. Mozqueda-Martinez boarded it, and Defendant was present when the vehicle was stopped.

He then described a brief chase of the vehicle and the eventual apprehension of the van and its

occupants, including Defendant.

On cross-examination, defense counsel had the following exchange with Agent Binkley:

Q:     On the day in question, as far as you know, was there any moment when
       you or other agents lost track of the van?
A:     No, sir.
Q:     Was there at any point during the chase of the van, did anyone that you
       were working with that day lose surveillance on the van?
A:     No.
Q:     Or its occupants?
A:     No, sir.
Q:     Would it be fair to say that the group was tracked literally from the
       moment it entered the United States to the moment they were all
       apprehended?
A:     Literally as in following footprints?
Q:     No, sir.  Would it be fair to say that from the moment that El Paso sector
       advised I believe it's agent Marion Anest that there was sensor activity,
       that you all were able to follow the group up until everyone was
       apprehended?
A:     Yes, sir.
Q:     Is that a fair statement?
A:     Yes, sir.

Tr. of Proceedings at 99-100.  During the remainder of cross-examination of Agent Binkley, the

defense elicited testimony confirming that although the individuals in the van attempted to flee

the arresting officers, no one escaped and Border Patrol accounted for all the van's occupants.

An account of the remainder of the evidence presented by the government is not

necessary for purposes of the present motion.  At the close of the government's case, the defense

moved for judgment of acquittal pursuant to Rule 29(a), arguing that the government had not

proven beyond a reasonable doubt that Valente Mozqueda-Martinez ever entered the United

States.  Defendant now renews his motion and additionally argues with respect to his conspiracy

conviction that the government failed to prove the necessary element of interdependence.

7

**DISCUSSION**

In ruling on a defendant's motion for judgment of acquittal, the Court must view all the evidence in the light most favorable to the government. *United States v. Ramirez*, 348 F.3d 1175, 1180 (10th Cir. 2003) (citing *United States v. Bailey*, 327 F.3d 1131, 1140 (10th Cir. 2003)). The Court must then "determine whether there is evidence from which a jury could find the defendant guilty beyond a reasonable doubt." *Id.*

**I.      Count 1: Conspiracy**

To meet its burden on the conspiracy count, the government must prove: "(1) that two or more persons agreed to violate the law, (2) that the defendant knew at least the essential objectives of the conspiracy, (3) that the defendant knowingly and voluntarily became a part of it, and (4) that the alleged coconspirators were interdependent." *United States v. Caldwell*, 589 F.3d 1323, 1329 (10th Cir. 2009) (quoting *United States v. Sells*, 477 F.3d 1226, 1235 (10th Cir. 2007)). Defendant does not argue that the government failed to prove any of the first three elements of conspiracy (indeed, Mr. Hernandez's testimony supports the jury's finding with respect to these three elements), but limits his argument to the element of interdependence. Interdependence "requires that a defendant's actions facilitate the endeavors of other alleged coconspirators or facilitate the venture as a whole." *United States v. Carnagie*, 533 F.3d 1231, 1238 (10th Cir. 2008). Interdependence "exists where coconspirators intend to act together for their shared mutual benefit within the scope of the conspiracy charged." *Id.* (internal quotations and alterations omitted).

In *Carnagie*, the Tenth Circuit examined whether the government had presented sufficient evidence to sustain conspiracy convictions for multiple defendants who engaged in a fraudulent real estate scheme. *See id.* The court noted that the element of interdependence in the context of generally lawful activity such as selling real estate requires more proof than that needed for a drug conspiracy conviction. *Id.* at 1239 n.5. The court explained:

> Each participant [in a drug conspiracy] is presumptively aware of the illegal nature of the activity and of the existence of the illegal venture. As a result, we have said that where large quantities of narcotics are being distributed, each major buyer may be presumed to know that he is part of a wide-ranging venture, the success of which depends on performance by others whose identity he may not even know, and evidence that a defendant is a major supplier of drugs is sufficient to infer knowledge of the broader conspiracy. In other words, interdependence in a drug conspiracy may stem from the illegal nature of the drug trade itself.

*Id.* (quotations omitted). This observation logically extends to the context of an immigrant smuggling venture, where each alleged conspirator is presumptively aware of the illegality of the underlying conduct. Certainly in the present case, the evidence presented would easily support a conclusion that Defendant and Mr. Hernandez were aware of the illegality of their conduct, as they attempted to flee from the Border Patrol agents who stopped the van. The jury was entitled to give credence to Mr. Hernandez's testimony, wherein he described Defendant's telephone conversations with other people involved in the smuggling venture, and to infer from this testimony that the scheme involved multiple actors who relied on each other to accomplish the illicit goal of bringing a group of undocumented individuals into the United States for financial gain.

Moreover, the facts of the instant case establish a very basic form of interdependence. Defendant was dependent upon Mr. Hernandez because he needed to use his van. Mr. Hernandez was dependent upon Defendant, without whom he could not have participated in the

smuggling venture, because only Defendant was in contact with the smugglers in Mexico.  In the aggregate, the evidence presented by the government was more than adequate to prove interdependence among the co-defendants, especially when viewed in the light most favorable to the prosecution.  Accordingly, the Court must uphold the jury's verdict with respect to Count 1 of the Indictment.

## II.    Count 3: Transportation

At issue with respect to Count 3 is whether or not the government met its burden of proving beyond a reasonable doubt that Defendant transported Valente Mozqueda-Martinez into the United States, knowing or in reckless disregard of the fact that Mr. Mozqueda-Martinez had come to, entered, or[5] remained in the United States in violation of the law.  Indictment, Count 3 [Doc. 36].  Pursuant to the parties' joint jury instructions, the Court instructed the jury as follows:

> The defendant is charged in count 3 of the Indictment with a violation of 8 U.S.C. section 1324(a)(1)(A)(ii).  This law makes it a crime to illegally transport an alien. To find the defendant guilty of this crime you must be convinced that the government has proved each of the following beyond a reasonable doubt:

---

[5] Although the Indictment uses the conjunctive "and" to describe the offense, the statute itself criminalizes the transportation of "an alien [who] has come to, entered, *or* remains in the United States in violation of law. . . ."  8 U.S.C. 1324(a)(1)(A)(ii) (emphasis added).  A jury may convict on any of the elements of a disjunctively defined offense, even if the indictment charges the offense in conjunctive language.  *United States v. Arias*, 253 F.3d 453, 457-58 (9th Cir. 2001); *United States v. Booth*, 309 F.3d 566, 572 (9th Cir. 2002); *see also United States v. Miller*, 471 U.S. 130,135 (1985) ("The Court has long recognized that an indictment may charge numerous offenses or the commission of any one offense in several ways.  As long as the crime and the elements of the offense that sustain the conviction are fully and clearly set out in the indictment, the right to a grand jury is not normally violated by the fact that the indictment alleges more crimes or other means of committing the same crime.").  Hence, the government need have proven that Mr. Mozqueda-Martinez came to, entered, *or* remained in the United States, but need not have proven all three.  Below, the Court will address the differences between these three terms in detail.

> *First*: Valente Mozqueda-Martinez was an alien;
> *Second*: Valente Mozqueda-Martinez entered or remained in the United
> States unlawfully;
> *Third*: the defendant knew, or recklessly disregarded the fact, that Valente
> Mozqueda-Martinez was not lawfully in the United States;
> *Fourth*: the defendant transported or moved, or attempted to transport or
> move, Valente Mozqueda-Martinez, intending to help him remain in the
> United States illegally; and
> *Fifth*: the defendant committed the offense for the purpose of commercial
> advantage or private gain.

Jury Instr. 16 [Doc. 95].  Defendant does not argue that the government failed to prove the first,

third, fourth or fifth elements listed above.  Rather, the Court's inquiry is limited to the second

element of whether or not Mr. Mozqueda-Martinez entered or remained in the United States.

### A.    Legal Definition of "Entry"

Complicating the Court's inquiry with respect to Mr. Mozqueda-Martinez is the fact that

the meaning of "entry" into the United States is far more complex and less concrete than the

general common understanding of the term.  The Ninth Circuit has explained:

> [A]s a matter of law . . . physical presence is not enough [to find that an alien entered
> the United States].  That is most clearly shown in the concept of "entry," a concept
> which has a long judicial history.  As the Supreme Court has pointed out, "[t]he
> definition of 'entry' as applied for various purposes in our immigration laws was
> evolved judicially."

*United States v. Pacheco-Medina*, 212 F.3d 1162, 1163 (9th Cir. 2000) (quoting *Rosenberg v.*

*Flueti*, 374 U.S. 449, 453 (1963)).

While the Tenth Circuit has not addressed the question of what proof is required to show

that an individual has entered the United States, over thirty years ago the Board of Immigration

Appeals (BIA) set forth a clear definition of "entry" in the context of civil immigration law.  *See*

*Matter of Pierre*, 14 I. & N. Dec. 467, 468 (BIA 1973).  The BIA first observed that the term

11

"entry" was defined in a now amended version of 8 U.S.C. § 1101(a)(13)[6] as " . . . any coming of

an alien into the United States, from a foreign port or place or from an outlying possession. . . ."

*Id*.  As the Ninth Circuit has noted, this definition is unhelpful in determining whether someone

did or did not enter the United States.  *United States v. Oscar*, 496 F.2d 492, 493 (9th Cir. 1974).

However, the BIA looked to the judicial evolution of the term "entry" and accordingly

established:

> A survey of the many cases which have treated this subject over the years leads to
> the following conclusion: An "entry" involves (1) a crossing into the territorial limits
> of the United States, *i.e.* physical presence; plus (2) inspection and admission by an
> immigration officer, or (3) actual and intentional evasion of inspection at the nearest
> inspection point; coupled with (4) freedom from restraint.

*Matter of Pierre*, 14 I. & N. Dec. at 468 (citations omitted).  The Board went on to hold that

"[t]he restraint may take the form of surveillance, unbeknownst to the alien; he has still not made

an entry despite having crossed the border with the intention of evading inspection, because he

lacks the freedom to go at large and mix with the population."  *Id*. at 469.

All federal circuits having addressed this question have adopted the BIA's position that

mere presence is insufficient to establish entry.  *See United States v. Kavazanjian*, 623 F.2d 730,

736 (1st Cir. 1980) ("Most courts that have construed this term have concluded that 'entry' is not

accomplished until physical presence of an alien in this country is accompanied by freedom from

official restraint.") (citations omitted); *Zhang v. Slattery*, 55 F.3d 732, 752-53 (2d Cir. 1995),

*abrogated on other grounds by* 8 U.S.C. § 1101(a)(42) ("mere presence in the United States has

---

[6] Subsection (A) of that provision now defines the terms "admission" and "admitted" as
"the lawful entry of the alien into the United States after inspection and authorization by an
immigration officer."  8 U.S.C. § 1101(a)(13)(A) (West 2009).  Section 1101, which is titled
"Definitions," no longer defines the term "entry."

never been sufficient to constitute 'entry'. . . .  An entry involves: (1) a crossing into the
territorial limits of the United States, *i.e.* physical presence; (2)(a) an inspection and admission
by an immigration officer or (b) actual and intentional evasion of inspection at the nearest
inspection point; and (3) freedom from official restraint.") (quotations and citations omitted);
*Yang v. Maugans*, 68 F.3d 1540, 1547-50 (3d Cir. 1995) (defining elements of entry as: (1)
physical presence within territorial limits of United States; (2) inspection and admission by
immigration officer or actual evasion of inspection at nearest inspection point; and (3) freedom
from official restraint); *Chen Zhou Chai v. Carroll*, 48 F.3d 1331, 1343 (4th Cir. 1995) ("There
is no formal entry into the United States until the alien has been freed from . . . official
restraint."); *United States v. Villanueva*, 408 F.3d 193, 198-99 n.5 (5th Cir. 2005) ("[F]ederal
courts have recognized since 1908 that 'entering' the United States requires more than mere
physical presence within the country.  To 'enter,' an alien must cross the United States border
free from official restraint.  'Official restraint' may take the form of surveillance that is
unbeknownst to the alien, because although the alien has crossed the border, he does not have the
freedom to go at large and mix with the population.") (quotations and citations omitted);
*Nyrienda v. Immigration and Naturalization Service*, 279 F.3d 620, 623 (8th Cir. 2002) ("An
entry has several components: (1) a crossing into the territorial limits of the United States; (2)(a)
inspection and admission by an immigration officer, or (b) actual and intentional evasion of
inspection at the nearest inspection point; and (3) freedom from official restraint."); *United
States v. Pacheco-Medina*, 212 F.3d 1162, 1164 (9th Cir. 2000) ("[B]efore he can be said to have
entered, an alien must be free from restraint.  More particularly, the restraint may take the form
of surveillance, unbeknownst to the alien; he has still not made an entry despite having crossed

13

the border with the intention of evading inspection, because he lacks the freedom to go at large

and mix with the population.") (quotations, citations and alterations omitted); *Farquharson v.*

*U.S. Atty. Gen.*, 246 F.3d 1317, 1320-21 (11th Cir. 2001) ("The [Board of Immigration Appeals]

has established that an entry . . . requires: (1) a crossing into the territorial limits of the United

States; (2)(a) inspection and admission by an immigration officer, or (b) actual and intentional

evasion of inspection at the nearest inspection point; and (3) freedom from official restraint. . . .

[C]onstructive restraint may consist of surveillance which, though unknown to the alien, causes

the alien to lack the freedom to go at large and mix with the population.") (quotations and

citations omitted).  Indeed, it appears that the only cases in which courts examined the definition

of "entry" and concluded otherwise predate the Immigration and Nationality Act.  *See*, *e.g.*,

*United States v. Vasilatos*, 209 F.2d 195 (3d Cir. 1954).

   As the Fifth Circuit noted, the history of this doctrine dates back to 1908.  *Villanueva*,

408 F.3d at 199 n.5.  The Fifth Circuit was referring to a case in which the Second Circuit

affirmed the district court's holding that:

> "Enter" means more than the mere act of crossing the border line.  Those who seek
> to enter in the sense of the law, and those the policy of the law seeks to prevent from
> entering, are those who come to stay permanently, or for a period of time, or to go
> at large and at will within the United States.

*Ex Parte Chow Chok*, 161 F. 627, 630 (N.D.N.Y.), *aff'd*, 163 F. 1021 (2d Cir. 1908).  With this

principle as its foundation, the *Chow Chok* court held that a group of Chinese nationals had not

actually entered the United States – despite their journey for a quarter mile along railroad tracks

in New York – because they had been under the surveillance of border inspectors the entire time.

*Id*. at 628-29.

Throughout the twentieth century, this concept of "entry" continued to evolve in the context of immigration law, where historically a non-citizen petitioner wished to show that he or she *did* in fact "enter" the United States within the meaning of the relevant immigration law provision. This is because prior to 1996, the civil immigration system utilized two types of proceedings in which non-citizens could be expelled from the country: deportation hearings and exclusion hearings. *Landon v. Plasencia*, 459 U.S. 21, 25 (1982). Under the pre-1996 immigration laws, once an individual had effected an "entry," he or she would be entitled to a deportation proceeding, whereas the government could exclude someone who had not "entered" through an exclusion hearing. *Id*. Deportation proceedings afforded many advantages that exclusion proceedings did not, including advance notice of the charges, direct appeal to the court of appeals and a right to designate the country of destination. *Correa v. Thornburgh*, 901 F.2d 1166, 1171 n.4 (2d Cir. 1990).

While most federal circuits have adopted the "entry" doctrine in the civil immigration context, only a few have examined its application in criminal cases. In the year following *Matter of Pierre*, the Ninth Circuit confronted the question of whether or not to extend the BIA's definition of "entry" to the context of immigration crime. *Oscar*, 496 F.2d 492. In *Oscar*, two criminal defendants convicted under 8 U.S.C. § 1325 for aiding and abetting the illegal entry of two non-citizens into the United States, appealed their convictions and argued that the individuals had never effected an "entry." *Id*. at 492-93. It was uncontested that the individuals in question never made it past the primary inspection point at the United States border, where Customs officials discovered that their passports were false. *Id*. The government, however, urged the Ninth Circuit to distinguish the line of cases upon which the *Matter of Pierre* rule

15

rested, simply on the basis that they were civil immigration cases, rather than federal criminal

cases.  *Id*. at 493.

The Ninth Circuit declined to distinguish the federal criminal and civil immigration

contexts, because both require courts to interpret "entry" as it is defined in the Immigration and

Nationality Act (INA).  *Id*. at 493-94.  The court observed: "It is unlikely that Congress would

define a term in [8 U.S.C.] § 1101 for use throughout Chapter 12 if it intended the term to have

different meanings in different sections of the chapter."  *Id*. at 494.  The *Oscar* court

acknowledged its "duty to construe criminal statutes strictly," *id*. (citing *United States v. Bass*,

404 U.S. 336 (1971)), and accordingly held that the BIA's construction of the term "entry" as set

forth in the INA also applies to § 1325.  Therefore, the individuals in question never "entered"

the United States "because they were never free from the official restraint of [] customs

officials."  *Id*. at 493-94.

### B.      Evolution of the Doctrine of Official Restraint

The *Oscar* court appears to be the first to extend the definition of "entry" under civil

immigration law to immigration crime.  The Ninth Circuit has consistently upheld *Oscar* in the

criminal context, affirming that an individual has not "entered" the United States for purposes of

criminal immigration laws until he or she has achieved freedom from official restraint.  *See*, *e.g.*,

*Pacheco-Medina*, 212 F.3d at 1164; *United States v. Lopez-Perera*, 438 F.3d 932, 935 (9th Cir.

2006); *United States v. Cruz-Escoto*, 476 F.3d 1081, 1085 (9th Cir. 2007).  Both the Fifth Circuit,

*see United States v. Cardenas-Alvarez*, 987 F.2d 1129, 1133 (5th Cir. 1993), and the First

Circuit, *see Kavazanjian*, 623 F.2d at 736, cited *Oscar* with approval in immigration crime cases.

16

In *Pacheco-Medina*, the Ninth Circuit extended the official restraint doctrine to the crime of illegal reentry following deportation.  The defendant had illegally returned to the United States just two days after his last deportation.  212 F.3d at 1163.  He climbed the United States-Mexico international boundary fence and a Customs Service camera detected him while he was scaling the fence.  *Id*.  He landed on the United States side of the fence to find a Border Patrol Agent awaiting him, and a chase ensued.  *Id*.  The defendant remained in the agent's sight (apart from a matter of a few seconds when he rounded a corner), and the agent apprehended him within yards of the border.  *Id*.

The Ninth Circuit surveyed the history of the concept of "entry" in immigration law, and confirmed that "before he can be said to have entered, an alien must be free from restraint."  *Id*. at 1164 (citing *Matter of Pierre*, 14 I. & N. Dec. at 468).  The court noted the BIA's construction of the concept of restraint:

> [T]he restraint may take the form of surveillance, unbeknownst to the alien; he has still not made an entry despite having crossed the border with the intention of evading inspection, because he lacks the freedom to go at large and mix with the population.

*Id*.  (citing *Matter of Pierre*, 14 I. & N. Dec. at 469).  The court then noted two instances where it had found that a criminal defendant *had* in fact entered, because he or she was at least temporarily free from official restraint at some point after setting foot on United States soil.  *Id*. at 1164-65 (citing *United States v. Martin-Plascencia*, 532 F.2d 1316 (9th Cir. 1976) and *United States v. Aguilar*, 883 F.2d 662 (9th Cir. 1989)).  The court went on to distinguish the *Pacheco-Medina* defendant's case from these two cases:

> [Pacheco-Medina] was under constant and close surveillance and had no hope of escaping into the general population of the United States.  He was observed by government agents as he began his attempt to cross the border, and he never left their

> sight. . . .  He was in the clutches of the authorities the whole time and had no opportunity to get free of them. . . .  He was precluded from [entering the country] because he was under official restraint the whole time.

*Id*. at 1165.  Accordingly, the Ninth Circuit reversed the defendant's conviction for illegal reentry following deportation and remanded the case for entry of a judgment of not guilty.  *Id*. at 1166.

As noted above, the Fifth Circuit has adopted the Ninth Circuit's rule pertaining to freedom from restraint, albeit in a footnote:

> To "enter," an alien must cross the United States border free from official restraint. "Official restraint" may take the form of surveillance that is unbeknownst to the alien, because although the alien has crossed the border, he does not have the freedom to go at large and mix with the population.

*Villanueva*, 408 F.3d at 198-99 n.5 (citing *United States v. Gonzalez-Torres*, 309 F.3d 594, 598 (9th Cir. 2002)).  This Court has found no instance of any district or circuit court rejecting the Ninth Circuit's extension of the official restraint doctrine in the criminal context.

### C.    Application of Official Restraint Doctrine to Offenses Under 8 U.S.C. § 1324

As detailed above, a thorough examination of the evolution of the official restraint doctrine demonstrates that it has deep historical roots in immigration law.  As the court noted in *Oscar*, neither the plain language nor the legislative history of the Immigration and Nationality Act reveal any basis for distinguishing between "entry" in civil immigration law and "entry" in the context of immigration crime.  *See* 496 F.2d at 493-94.  However, application of the doctrine of official restraint to the instant case does not dispose of the present issue, because Defendant's conviction under § 1324 must be distinguished from those defendants convicted of illegal entry under §1325 or illegal reentry under § 1326.

18

Section 1324(a)(1)(A)(ii) prohibits the knowing or reckless transportation within the United States of "an alien [who] has come to, entered, or remains in the United States in violation of law."  8 U.S.C. §1324(a)(1)(A)(ii).  In contrast, pursuant to Tenth Circuit Criminal Pattern Jury Instruction 2.03, the Court in this case instructed the jury that in order to convict Defendant, it must find that "Valente Mozqueda-Martinez entered or remained in the United States unlawfully."  Jury Instr. 16 [Doc. 95].  It is now apparent that the Court should have instructed the jury that it was required to find that Mr. Mozqueda-Martinez *came to*, entered or remained in the United States unlawfully.  *See* 8 U.S.C. §1324(a)(1)(A)(ii).

At first blush, "came to" and "entered" would appear to be synonymous.  However, the relevant case law reveals otherwise.  In *United States v. Hernandez-Garcia*, 284 F.3d 1135 (9th Cir. 2002), the defendant argued for reversal of his conviction for transporting immigrants under § 1324, on grounds that the individuals he was convicted of transporting never entered the United States.  In that case, the United States Border Patrol maintained constant surveillance on the group of immigrants from the United States-Mexico border until the moment they were apprehended.  *Id*. at 1136-37.  Examining the relevant statutory language, the Ninth Circuit stated:

> The crime is the *transportation* of an illegal alien within this country, not the alien's reentry.  So long as an alien has come to the United States unlawfully and the transporter knows this (or recklessly disregards this fact), and the alien is transported within the United States, it is immaterial whether the *alien* has technically "entered" the country or not.

*Id*. at 1138 (emphasis in original).

The Ninth Circuit's conclusion in *Hernandez-Garcia* rested on Congress's 1986 amendments to § 1324.  The court explained that the 1986 revisions replaced the portions of the

statute that could be read as requiring "entry" with the disjunctive language requiring "that an alien has come to, entered, or remains in the United States in violation of law." *Id.* (quoting 8 U.S.C. §1324(a)(1)(A)(ii)). The court elaborated:

> [T]he discussion on smuggling and related offenses in § 1324 indicates that Congress intended to separate the concept of bringing or coming to the United States from "entry." For example, the House Report reflects disagreement with the judicial interpretation of the former version of § 1324(a)(1) that had equated "bring into" with entry. Accordingly, this section was amended from "bring *into*" to "bring *to*." §§ 1324(a)(1)(A)(i), 1324(a)(2) (recodifying § 1324(a)(1) (1986)) (emphasis added). Whether or not "bring *into*" was properly construed as synonymous with "entry," bring *to* – and come *to* – cannot be.

*Id.* at 1138-39 (citation omitted; emphasis in last sentence in original). The court concluded that § 1324's reference to "come *to*" is distinguishable from the act of "coming *into*" the United States, and the government need not prove entry to sustain a transportation conviction under 8 U.S.C. §1324(a)(1)(A)(ii). *Hernandez-Garcia*, 284 F.3d at 1139.

This Court has examined the legislative history cited by the *Hernandez-Garcia* court, and finds that it supports that court's conclusion that "entry" is not required to support a conviction under § 1324. The House Report pertaining to the 1986 Immigration Reform and Control Act states:

> [These amendments are] designed to correct the shortcomings and ambiguities in existing law identified in *United States v. Anaya*, 509 F. Supp. 2289, *en banc*, (S.D. Fla. 1980), *aff'd on other grounds, sub nom. United States v. Zayas-Morales*, 685 F. 2d. 1272 (11th Cir. 1982)) and in *United States v. Zayas-Morales* as well. The issue in *Anaya* was whether current law ([8] U.S.C. 1324(a)(1)) would subject to criminal prosecution certain boat owners and crew members who willingly and knowingly transported undocumented Cuban nationals to the United States during the Mariel boatlift of 1980. Of crucial significance was the fact that the defendants in the case made no effort to land any undocumented Cubans surreptitiously or evasively, but instead brought them directly to immigration officers in Key West. Because existing law makes it a felony for anyone to "bring into" the United States an undocumented alien, the issue became the meaning of the term "bring into." The district court, sitting *en banc*, resolved this issue by holding that "bring into" is synonymous with

"entering", and that since none of the undocumented Cubans ever "entered" the
United States the indictments had to be dismissed. . . . [T]his gap in current law must
be closed . . . [so as to] deter potential transporters from inundating U.S. ports of
entry with undocumented aliens. . . . Accordingly, the bill clarifies that a person who
knowingly transports an undocumented alien to any place in the United States will
be subject to criminal prosecution if that person knew the alien was undocumented
or acted with wilful blindness concerning the alien's immigration status.

H.R. REP. NO. 99-682, pt. 1, at 65-66 (1986).

It would follow from the logic of the House Report that the 1986 amendments to § 1324

eliminated the statute's reference to "bring into" in favor of "bring to" to clarify that a defendant

may be convicted of transportation under §1324(a)(1)(A)(ii) even if the people he or she

transports never make it "into" the United States.  Indeed, a contrary reading of the statutory

language proscribing the transportation of one who has unlawfully "come to, entered, or remains

in the United States" would render the use of "come to" and "entered" surplusage.  Rather, it is

quite clear from the House Report that Congress intended to criminalize the transportation of

undocumented individuals on United States soil, regardless of whether or not their presence here

meets the legal definition of "entry."

This Court's inquiry is therefore *not* whether or not the government presented sufficient

evidence to allow a rational trier of fact to conclude beyond a reasonable doubt that Valente

Mozqueda-Martinez *entered* the United States.  Rather, the Court must determine whether or not

the evidence presented, when viewed in the light most favorable to the government, could allow

the jury to conclude that Mr. Mozqueda-Martinez *came to* the United States.  The Court's review

of *Hernandez-Garcia* and the authority upon which it rests demonstrates that to "come to" the

United States within the meaning of § 1324, one need only set foot on United States soil.  *See*

*United States v. Munoz*, 412 F.3d 1043, 1048-49 (9th Cir. 2005) (holding that an individual

21

being smuggled into the United States "comes to" the United States when he crosses the border whether or not he is under official restraint).

The evidence presented at trial leaves no question that Mr. Mozqueda-Martinez was present on United States soil.  It is true that the government presented no evidence as to the location of the sensor that the group of immigrants triggered, nor did the government offer any evidence in response to defense counsel's suggestion that the international boundary fence has cameras in various locations.  While Agent Anest testified that *he* first saw the group of immigrants about a quarter of a mile north of the border, the government presented no evidence as to whether or not anyone was monitoring the group prior to Agent Anest's sight of them.  On redirect-examination of Agent Binkley, the government did nothing to clarify the agent's affirmative response to defense counsel's question regarding whether or not Border Patrol followed the group "from the moment that El Paso sector advised . . . Agent Marion Anest that there was sensor activity."  Tr. of Proceedings at 100.  This sheer lack of evidence does leave a reasonable doubt as to whether the group actually "entered" the United States such that they were free from official restraint in the form of surveillance.  However, the uncontroverted testimony of the multiple Border Patrol officers involved in Defendant's apprehension easily meets the government's burden of proof beyond a reasonable doubt that Valente Mozqueda-Martinez crossed the border, and hence "came to" the United States without lawful authorization.

Finally, the Court notes that although it did incorrectly instruct the jury – indeed, the Tenth Circuit's pattern jury instruction on transportation offenses under § 1324 is in tension with established law in all but three other federal circuits – this error was harmless.  If anything, the

22

error created potential prejudice against the government, because the Court failed to instruct the jury that Mr. Mozqueda-Martinez's "coming to" the United States would have been sufficient to support a guilty verdict.

The Court's instruction was flawed in precisely the same manner as the instruction the district court gave in *Hernandez-Garcia*, where the Ninth Circuit concluded that the failure to instruct the jury on a "come to" theory was harmless because "the instruction[] went beyond what was required."  284 F.3d at 1139.  As in *Hernandez-Garcia*, the jury's verdict necessarily rested on a finding that Valente Mozqueda-Martinez either entered or remained in the United States.  If the jury found that Mr. Mozqueda-Martinez "entered" the United States – whether a correct finding or not – it necessarily found that he "came to" the United States.  *See id.* ("to come *to* the United States is a step subsumed by the court's definition of 'entry'" (emphasis in original)).  Nor would it have been possible for the jury to find that Mr. Mozqueda-Martinez "remained in" the United States without first finding that he "came to" the United States.  *See United States v. Santana-Castellano*, 74 F.3d 593, 597 (5th Cir. 1996) (assuming that one "remains" in the country only after first having "entered"); *United States v. Ortiz-Villegas*, 49 F.3d 1435, 1436 (9th Cir. 1995) (same).  Therefore, the instruction requiring a finding that Mr. Mozqueda-Martinez "entered or remained in the United States" was merely superfluous, and caused no prejudice to Defendant.  *See Hernandez-Garcia*, 284 F.3d at 1139-40.  As none of the remaining elements the government was required to prove under § §1324(a)(1)(A)(ii) are in dispute, the Court must uphold the jury's guilty verdict with respect to Count 3 of the Indictment.

**CONCLUSION**

When viewed in the light most favorable to the prosecution, the evidence the government

presented at trial supports the jury's guilty verdict as to both counts of the Indictment.  **IT IS**

**THEREFORE ORDERED** that Defendant's Motion for Judgement of Acquittal [Doc. 99] is

**DENIED**.

Dated: this 5th day of May, 2010.

MARTHA VAZQUEZ
CHIEF U.S. DISTRICT COURT JUDGE